# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

DONNA McDONNELL,  )
                  )
Plaintiff,        )
                  )          Civil Action No.
v.                )          10-40057-FDS
                  )
MICHAEL J. ASTRUE, Commissioner, )
Social Security Administration,  )
                  )
Defendant.        )
                  )
_____

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION TO REVERSE AND
## DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal from the final decision of the Commissioner of the Social Security Administration denying plaintiff Donna McDonnell's application for social security disability insurance ("SSDI") benefits. Plaintiff contends that the administrative law judge ("ALJ") erred by (1) failing to consider plaintiff's morbid obesity when determining her ability to perform substantial gainful activity in violation of SSR 02-1p and (2) finding plaintiff's subjective complaints not credible without supporting that conclusion with specific facts and substantial evidence.

Pending before the Court is plaintiff's motion to reverse the administrative decision and the Commissioner's motion to affirm. For the reasons set forth below, the motion to affirm will be granted, and the motion to reverse will be denied.

# I. Factual Background

## A. Employment History

Donna McDonnell is a 63-year-old high school graduate. (AR at 18-19). She is 5' 1" tall and weighs 232 pounds. (*Id.* at 19). She is married and lives with her husband. (*Id.* at 18). She worked as an accounts receivable clerk until she stopped working on July 31, 2006. (*Id.* at 20-21, 80).

## B. Medical Evidence

### 1. Knee Replacement Surgeries

On May 17, 2004, McDonnell had a left knee diagnostic arthroscopy[1] with partial medial meniscectomy[2] and chondroplasty[3] to the medial femoral condyle and lateral femoral condyle.[4] (*Id.* at 142). After this procedure, Kevin Bowman, M.D., diagnosed McDonnell with (1) a left knee medial meniscus tear; (2) left knee lateral meniscus discoid meniscus; and (3) degenerative joint disease of the left knee involving the medial, lateral, and patellofemoral compartments. (*Id.*).

On November 23, 2004, Heather Hardie, M.D., conducted a leg length study. (*Id.* at 149-50). It indicated that there was a near complete loss of the medial joint space of the left knee. (*Id.* at 149). There was also mild medial compartment narrowing of the right knee. (*Id.*). The study also revealed that she had a significant pelvic tilt. (*Id.*).

---

[1] An arthroscopy is an "endoscopic examination of the interior of a joint." STEDMAN'S MEDICAL DICTIONARY 151 (26th ed. 1995).

[2] A meniscectomy is an "excision of a meniscus, usually from the knee joint." *Id.* at 1088. The medial meniscus is "a crescent-shaped structure . . . attached to the medial border of the upper articular surface of the tibia." *Id.* at 1089.

[3] Chondroplasty is "reparative or plastic surgery of cartilage." *Id.* at 332.

[4] The condyle is "a rounded articular surface at the extremity of a bone." *Id.* at 380.

On November 29, 2004, McDonnell underwent a total left knee replacement.  (*Id.* at 145).
In his discharge summary report on December 12, 2004, Dr. Bowman indicated that McDonnell
had a history of severe degenerative joint disease, type II diabetes, and hypertension. (*Id.*).  He
also indicated that she would need physical therapy and opined that her rehabilitation potential
was "good."  (*Id.* at 146).

On November 30, 2004, an x-ray of McDonnell's post-operative left knee demonstrated
that it was aligned, and there was no evidence of a loosening of the prosthesis.  (*Id.* at 151).
There was post-operative soft tissue swelling.  (*Id.*).

On March 7, 2005, McDonnell underwent a closed manipulation and placement of a
femoral catheter in her left knee.  (*Id.* at 155).  Her post-operative diagnosis was arthrofibrosis.
(*Id.*).  Dr. Bowman stated that his treatment plan involved aggressive physical therapy.  (*Id.* at
155-56).

On May 5, 2006, McDonnell was discharged from physical therapy.  (*Id.* at 171).  The
physical therapist indicated that McDonnell had attended five physical therapy sessions; however,
she missed four.  (*Id.*).  The physical therapist stated that she should continue with a home
exercise program.  (*Id.*).

McDonnell stopped working on July 31, 2006, following a shoulder injury (discussed
below).  (*Id.* at 21, 80).

On August 6, 2006, McDonnell went to Milford Regional Medical Center Emergency
Room complaining of pain in her right knee.  (*Id.* at 157).  She reported that she had experienced
pain for approximately two weeks.  (*Id.*).  Her pain level was a two out of ten.  (*Id.* at 164).
Vivek Chander, M.D., noted that McDonnell's right knee was tender and swollen, but she

retained full range of motion. (*Id.*). An x-ray showed that the right knee was not fractured. (*Id.* at 164, 176). However, it did indicate that she had osteoarthritis. (*Id.*). Dr. Chander recommended a knee immobilizer; however, McDonnell refused it. (*Id.* at 164). Dr. Chander recommended Motrin and prescribed Vicodin. (*Id.*).

On December 5, 2006, McDonnell saw Dr. Bowman for a follow-up visit concerning her right knee pain. (*Id.* at 201). After sustaining complete relief from pain from a cortisone injection in her shoulder, she requested and received a cortisone injection in her right knee. (*Id.*).

On May 3, 2007, McDonnell received a second cortisone injection in her right knee. (*Id.* at 199-200). While Dr. Bowman noted that there was tenderness over the medial joint line, the rest of the examination was unremarkable. (*Id.*).

On July 19, 2007, McDonnell again saw Dr. Bowman concerning her right knee pain and osteoarthritis. (*Id.* at 197). She reported that she was feeling significant relief to her right knee pain after receiving a cortisone injection. (*Id.*). She also reported that she experienced four to five days of terrible knee pain. (*Id.*). Dr. Bowman noted that the knee was stable and the examination showed nothing remarkable. (*Id.*). He gave McDonnell a cortisone injection in her knee. (*Id.* at 198).

On December 13, 2007, McDonnell saw Dr. Bowman for another follow-up. (*Id.* at 195). She was using crutches to help her walk and occasionally taking Vicodin for pain. (*Id.*). She requested and received a cortisone injection for pain. (*Id.* at 195-96).

On June 25, 2008, McDonnell visited Richard D. Mulroy, Jr., M.D., an orthopedic surgeon, with complaints of extreme pain in her right knee. (*Id.* at 236-37). Dr. Mulroy strongly recommended that she undergo a total right knee replacement. (*Id.* at 237). He gave her a

cortisone injection for pain. (*Id.*).

Dr. Mulroy performed a total right knee replacement on McDonnell on September 15, 2008. (*Id.* at 233). A post-operative x-ray indicated that her knee prosthesis was satisfactorily aligned. (*Id.* at 231).

On October 24, 2008, Dr. Mulroy saw McDonnell for a follow-up visit. (*Id.* at 222-23). She reported that her pain level was at two to five out of ten. (*Id.* at 223). He noted that she was walking independently and that she wanted to know when she could drive. (*Id.* at 222). He also noted that she was not taking her prescription painkillers. (*Id.*). She informed Dr. Mulroy that her post-operative recovery this time was quicker and less painful than after her other total knee replacement. (*Id.*). Dr. Mulroy informed her that losing weight was extremely important. (*Id.*).

## 2.  **Right Shoulder Pain**

In July 2006, McDonnell tripped in her hallway, injuring her right shoulder. (*Id.* at 206). An x-ray taken on July 17, 2006, showed that the shoulder was not fractured. (*Id.* at 166). However, there was degenerative narrowing of the acromioclavicular joint. (*Id.*).

At an appointment with Dr. Bowman on July 26, 2006, McDonnell reported that since her accident she had experienced upper right arm pain. (*Id.* at 206). This was especially pronounced when she lifted her arms overhead. (*Id.*). McDonnell stated that her symptoms had improved since the injury. (*Id.*). Dr. Bowman offered her a cortisone injection in her right shoulder, but she declined. (*Id.* at 207). He referred her to physical therapy. (*Id.*).

As noted, McDonnell stopped working on July 31, 2006. (*Id.* at 21, 80).

On August 18, 2006, McDonnell had a follow-up appointment with Dr. Bowman. (*Id.* at 203). He noted that her shoulder symptoms were improving and that she was attending physical

therapy two times per week. (*Id.*). His examination revealed no atrophy or deformity of the shoulder. (*Id.*). Her sensory and motor functioning were within normal limits. (*Id.*). Dr. Bowman diagnosed right shoulder impingement syndrome. (*Id.* at 204). For pain relief, Dr. Bowman gave her a cortisone injection. (*Id.*). He also gave her a cortisone injection in her right knee. (*Id.*). In December 2006, she reported complete relief from her right shoulder symptoms. (*Id.* at 201).

### 3. Medications

McDonnell takes Atenolol for high blood pressure. (*Id.* at 28). She takes hydrochlorothiazide for fluid retention, and Metformin for diabetes. (*Id.*).

### C. Physical Residual Functional Capacity Assessment

On September 17, 2007, Henry Astarjian, M.D., a state agency physician, assessed McDonnell's residual functional capacity ("RFC"). (*Id.* at 187-94). He noted that her primary diagnosis was degenerative joint disease in her knees, and that her secondary diagnosis was diabetes and hypertension. (*Id.* at 187). Dr. Astarjian also noted that she contended that she was morbidly obese. (*Id.*).

As to exertional limitations, Dr. Astarjian concluded that McDonnell could occasionally lift 20 pounds and frequently lift ten pounds. (*Id.* at 188). She could stand or walk for at least two hours, but not more than three, in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.*). While she could push and pull, she should avoid using foot-operated machinery and actions requiring kicking, pressing, or stomping. (*Id.*).

In terms of postural limitations, Dr. Astarjian stated that McDonnell can never climb ladders, ropes, or scaffolds. (*Id.*). She can occasionally climb ramps and stairs, balance, kneel,

crouch, and crawl. (*Id.*). She can frequently stoop. (*Id.*).

No manipulative, visual, or communicative limitations were established. (*Id.* at 190-91). As far as environmental limitations, Dr. Astarjian said that she should avoid concentrated exposure to extreme cold, humidity, and vibration because they may aggravate her joint pains. (*Id.* at 191). Because she is not very agile, she should avoid hazards such as machinery and heights. (*Id.*).

Dr. Astarjian stated that plaintiff's claims of gout and shoulder pain were not documented. (*Id.* at 189). He noted, however, that McDonnell's endurance is low and that her "inefficient body mechanics jeopardize her mobility even more." (*Id.*).

### D.　Plaintiff's Testimony

On a typical day, McDonnell usually wakes up at 6:30 a.m. (*Id.* at 25). She will wash her face and comb her hair. (*Id.*). If her hands are bothering her, she will have her husband do any buttons on her clothing before he leaves for work. (*Id.*). She alternates between sitting and standing all day — sitting on the couch for about 30 minutes and then walking around the house. (*Id.*). She usually reads and watches television during the day. (*Id.* at 26). Her husband makes her dinner when he gets home for the day. (*Id.*).

In terms of daily activities, McDonnell testified that she can dress herself. (*Id.* at 22). She did note that her left hand tends to fall asleep and buttoning is difficult. (*Id.*). She also stated that she can bathe herself and helps her husband make the bed. (*Id.* at 22-23). She still has her driver's license, but says that she does not drive very often. (*Id.* at 23). She can also put on her own shoes. (*Id.* at 24).

For functional limitations, McDonnell testified that she can pick something up off the floor

if she dropped it. (*Id.*). Sometimes she uses a "gripper" instead of bending. (*Id.*). She also stated that she can climb stairs, but, after the sixth step, she needs to rest for a few minutes. (*Id.* at 24-25). She further testified that she could lift ten pounds and could, maybe, carry it a short distance. (*Id.* at 26). She also testified that she could stand in one place without pain for ten minutes and sit for 30 minutes. (*Id.*). She testified that her knees get tight in cold weather and that she will not walk outside. (*Id.* at 30). She uses a cane when her knees are bothering her. (*Id.*).

McDonnell testified that she experiences extreme pain in both her right and left knee. (*Id.* at 32). She stated that they get very tight, and she worries that they will "give out." (*Id.* at 32).

When asked why she thinks she can no longer work, McDonnell testified that she used to be able to sit all day and now cannot. (*Id.* at 28). Moreover, she cannot hold things in her left hand because it gets numb and tingly. (*Id.*). She also testified that she cannot type a lot with her right hand. (*Id.*). Furthermore, she has trouble writing. (*Id.* at 28-29). She testified that she is very fatigued and often does not sleep well because of the "pins and needles" sensations in her hands. (*Id.* at 29).

McDonnell testified that her former job as an accounts receivable clerk required her to talk on the phone, collect money, and record checks. (*Id.* at 32). She testified that she does not believe she retains the energy to perform that job, cannot hold the phone in her hand for an extended period, and cannot sit for a long period of time. (*Id.*).

## II.  **Procedural History**

Plaintiff applied for SSDI benefits on June 22, 2007, alleging that she became disabled on July 31, 2006.  (*Id.* at 80-84.)  In her application, she indicated that she suffered from bilateral knee pain, right shoulder pain, bilateral carpal tunnel syndrome, gout, diabetes, morbid obesity, and hypertension.  (*Id.* at 83).  The application was denied on initial review on September 20, 2007, and subsequently by a federal reviewing official on August 29, 2008.  (*Id.* at 50-52, 41-46).  She requested an administrative hearing, which was held on September 15, 2009.  (*Id.* at 17, 57).  Both plaintiff, who was represented by counsel, and a vocational expert testified.  (*Id.* at 17).

The ALJ issued its decision on October 8, 2009.  (*Id.* at 4-14.)  On January 21, 2010, the Decision Review Board notified plaintiff that although it had selected her case for review, it did not complete its review of her claim during the time allowed, and therefore the ALJ's decision had become final under 20 C.F.R. § 405.420(a)(2).  (*Id.* at 1).  Having exhausted her administrative remedies, plaintiff filed this complaint on March 27, 2010.  *See* 20 C.F.R. § 405.420(b)(2) (2010).

## III.  **Analysis**

### A.  **Standard of Review**

This Court's review of a Social Security disability benefit determination is limited.  *See* 42 U.S.C. § 405(g) (2010).  Questions of law are reviewed *de novo*, but findings of fact, "if supported by substantial evidence, shall be conclusive."  *See id.*; *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").  Substantial evidence means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

**B.      Standard for Entitlement to SSDI Benefits**

An individual is not entitled to SSDI benefits unless she is "disabled" within the meaning

of the Social Security Act. *See* 42 U.S.C. § 423(a)(1)(A), (d) (setting forth the definition of

disabled in the context of SSDI). "Disability" is defined, in relevant part, as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The impairment must be severe enough to prevent plaintiff from performing not only past work,

but any substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A)); 20

C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a

claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had . . . a severe impairment or
> combination of impairments, the application is denied; 3) if the impairment meets the
> conditions for one of the 'listed impairments' in the Social Security regulations, then
> the application is granted; 4) if the applicant's 'residual functional capacity' is such
> that [s]he . . . can still perform past relevant work, then the application is denied; 5)
> if the applicant, given his or her residual functional capacity, education, work
> experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[5] The claimant has the burden of

production and proof during steps one through four, and the Commissioner has the burden at step

five to offer evidence of specific jobs in the economy that the applicant can perform. *Freeman v.*

_____

[5] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

*Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

### C.    The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4), but concluded that it was unnecessary to proceed past step four. (AR at 13).

At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since July 31, 2006, her alleged onset date. (*Id.* at 9).

At step two, the ALJ determined that plaintiff had the following severe impairments: (1) bilateral total knee replacements due to degenerative joint disease and (2) obesity. (*Id.* at 9). The ALJ noted that plaintiff also contended that her diabetes, gout, carpal tunnel syndrome, and right shoulder impingement syndrome were severe impairments. (*Id.*). However, the ALJ stated that the record fails to establish that these conditions impose more than minimal limitations on her ability to work. (*Id.*).

At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 10). The ALJ considered both 1.02 and 1.03 but concluded that she did not meet the clinical requirements of those listings. (*Id.*).

At step four, the ALJ found that plaintiff has the residual functional capacity ("RFC") to perform less than the full range of light work. (*Id.*). She can lift and carry up to 20 pounds

occasionally and ten pounds frequently. (*Id.*). Moreover, she can sit for at least six hours, and stand or walk for two hours in an eight-hour workday. (*Id.*). He stated that she can never operate foot controls bilaterally, and may only occasionally climb ramps and stairs, kneel, crouch, or crawl. (*Id.*). She can never climb ladders, ropes, or scaffolding, and she must avoid concentrated exposure to cold, humidity, vibration, and hazardous machinery. (*Id.*).

The ALJ relied on the testimony of the vocational expert in comparing plaintiff's RFC to her past relevant work. (*Id.* at 13). Consistent with the vocational expert's opinion, the ALJ found that plaintiff retained the ability to complete her past work as an accounts receivable clerk, both as it is generally performed and as plaintiff performed it. (*Id.*). Because she retained a residual functional capacity to perform her past relevant work, the ALJ found that she was not disabled within the meaning of the Social Security Act. (*Id.* at 14-15).

### D. Plaintiff's Objections

Plaintiff contends that the ALJ erred by (1) finding plaintiff's subjective complaints not credible without supporting this conclusion with specific facts and substantial evidence and (2) failing to consider her morbid obesity when determining her ability to perform substantial gainful activity. The Court will address these arguments below.

#### 1. ALJ's Credibility Determination

Plaintiff contends that the ALJ did not adequately assess the credibility of plaintiff's statements regarding pain. The Court finds that this argument is without merit.

"The credibility determination by the ALJ, who observed the claimant, evaluated her demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. . . ." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir.

1987) (citing *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).

However, the ALJ "must make specific findings as to the relevant evidence he considered in

determining to disbelieve" the plaintiff. *Da Rosa*, 803 F.2d at 26. Here, the ALJ found that

plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms

are not credible to the extent they are inconsistent with the above residual functional capacity

assessment." (AR at 11). Because the ALJ supported his credibility determination with specific

and substantial evidence, the Court will uphold that determination.

As the ALJ explained, there was not objective evidence supporting plaintiff's allegations

of numbness and weakness in her hands. (*Id.* at 9). Moreover, despite her complaints of disabling

knee pain and instability, the ALJ cited that Dr. Bowman's examinations continually revealed the

knees were stable and in normal alignment. (*Id.* at 11-12, 201, 203, 21).

In addition to a lack of objective medical evidence to support her subjective complaints of

pain, the ALJ also noted discrepancies in her reports. First, the ALJ noted that despite Dr.

Bowman's recommendation that plaintiff undergo physical therapy to help ease the "tightness" in

her left knee, as of February 2006, she had failed to start therapy. (*Id.* at 11). Furthermore, while

claimant complained of pain in her right shoulder, in December 2006, she reported complete relief

from her right shoulder symptoms, and the record indicates that she has not seen a physician

about her right shoulder since that date. (*Id.* at 12, 201).

The ALJ also pointed out discrepancies in plaintiff's subjective complaints of pain and her

treatment history. The ALJ stated that plaintiff "received no treatment for her left knee after

February 2006 and she did not attend physical therapy for that knee as recommended in

November 2005." (*Id.* at 13). Furthermore, the ALJ highlighted the fact that plaintiff was not

taking medication for pain in May 2007 and only taking Vicodin occasionally in December 2007. (*Id.*).  In October 2008, she was only taking Tylenol (acteaminophen).  (*Id.*).  This evidence is inconsistent with her claims of continuing extreme pain in her knees.

### a. *Avery* Factors

Plaintiff further argues that the ALJ did not specifically discuss the factors for assessing subjective complaints of pain set forth in *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 23 (1st Cir. 1986).  Those factors are (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness, and adverse side effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.*; *see also* 20 C.F.R. §404.1529(c)(3); SSR 96–7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996).

Although the ALJ did not explicitly discuss every one of the *Avery* factors in his decision, he was not required to do so.  *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).  In any case, all of the factors were, in substance, discussed and considered during the hearing.

First, while the ALJ did not question plaintiff about the nature and intensity of her pain symptoms, her counsel did.  (AR at 29-32).  She testified that three or more times a week her knees became "tight."  (*Id.* at 29-30).  She noted that the tightening makes her anxious about walking places.  (*Id.* at 29).  She further testified that she has extreme pain in her left knee.  (*Id.* at 31).  Moreover, she stated that when she tries to stand, she is worried that they will give out on her.  (*Id.* at 32).  She further stated that she has numbing in her fingers regularly.  (*Id.* at 28-29).

Second, as to precipitating and aggravating factors, plaintiff testified that it is difficult for her to walk in bad weather. (*Id.* at 30). Additionally, she has difficulty walking on uneven surfaces. (*Id.*).

Third, the ALJ also questioned plaintiff about the medications she was taking and their side effects. (*Id.* at 28). She indicated that she took Atenolol for high blood pressure, hydrochlorothiazide for fluid retention, and Metformin for diabetes. (*Id.*). She testified that she did not experience any side effects. (*Id.*).

Fourth, as to alternatives to medications, plaintiff testified that she sometimes used a cane. (*Id.* at 30). Moreover, several doctors have recommended that plaintiff undergo physical therapy. (*Id.* at 146, 155-56, 171, 206-207).

Fifth, the ALJ also questioned plaintiff about her functional limitations. (*Id.*). She testified that she can squat and stoop to pick something up when she has dropped it. (*Id.* at 24). Sometimes, she requires the use of a gripper. (*Id.*). She also stated that she can lift her arms over her head occasionally. (*Id*) She said that she could only climb six stairs before she needed a break. (*Id.*). She also testified that she could lift ten pounds and carry it for a short distance. (*Id.* at 26). In terms of her ability to stand, she stated her limit would be ten minutes without pain. (*Id.* at 27). She could sit in one place for 30 minutes at a time. (*Id.*). She also testified that she has trouble gripping things due to "pins and needles" sensations in her hands and that her writing has changed. (*Id.* at 28-29). In addition, buttoning things is difficult. (*Id.* at 22).

Sixth, the ALJ elicited extensive testimony about plaintiff's daily activities during the hearing. (*Id.* at 21-29). She testified that she can sometimes dress herself and can usually bathe herself. (*Id.* at 22). She also stated that she does not cook very much and has not shopped in

years.  (*Id.*).  Furthermore, she testified that she helps make the bed.  (*Id.* at 23).  While she does not drive very often, she still has a driver's license.  (*Id.*).  Moreover, she indicated she had driven the day before.  (*Id.*).  She further testified that she watches television and reads during the day.  (*Id.* at 26).

In summary, the Court finds that the ALJ adequately explored the *Avery* factors during the administrative hearing and reversal is not warranted on that basis.

### 2.    Plaintiff's Morbid Obesity and SSR 02-1p

Plaintiff next contends that the ALJ failed to consider the effects of her morbid obesity when determining her ability to perform substantial gainful activity.  This argument is without merit.

Social Security Ruling 02-1p states that when a claimant is obese, "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment."  SSR 02-1p, 2000 WL 628049, at *6 (S.S.A Sept. 12, 2002).  It further notes that "the combined effects of obesity with other impairments may be greater than might be expected without obesity."  *Id.*  In order to find that plaintiff's obesity further impaired her ability to work, specific limitations related to plaintiff's obesity must be cited.  *See Skarbek v. Barnhart*, 2004 WL 1445932, at *3 (7th Cir. June 23, 2004) (plaintiff "does not specify how his obesity further impaired his ability to work, but *speculates merely* that his weight makes it more difficult to stand and walk.") (emphasis added); *Senay v. Astrue*, 2009 WL 229953, at *12 (D.R.I.  Jan. 30, 2009) ("Plaintiff did not testify to any limitations specifically attributable to her obesity at the . . . hearing, nor does she now identify any limitations resulting from her obesity which she alleges should have been considered.") (internal

citations omitted).

Plaintiff first contends that the ALJ failed to consider her difficulty with her hands. To support this, plaintiff quotes language in SSR 02-1p stating that "[t]he ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers." SSR 02-1p, 2000 WL 628049, at *6. However, plaintiff mischaracterizes her own testimony from the hearing. Although plaintiff did note that she had difficulty buttoning, writing, and typing, she stated that these difficulties resulted from the numbness in her hands, not her ability to manipulate due to a build-up of fatty tissue. (AR at 12, 22, 28). Therefore, plaintiff has not established that this limited dexterity is specifically-related to her obesity.[6]

The necessary relation to obesity is also missing from plaintiff's other purported limitations. Plaintiff contends that her obesity leads her to experience significant fatigue.[7] Again, plaintiff mischaracterizes her own testimony. She testified that her fatigue relates to her lack of sleep, and gave several reasons for the latter:

> [Plaintiff]: I think I'm tired a lot, very tired. I don't sleep.
>
> [ALJ]: And what do you attribute that to?
>
> [Plaintiff]: Some of it's to the hands, the pins and needles in my hand. It tends to bother me. I have to feel like I'm trying to wake it up all the time. And I get up a lot with the fluid, you know, to go to the bathroom with the diabetes. That's part of the diabetes. And I just

---

[6] Plaintiff's difficulty with her hands resulting from numbness and tingling may be a result of her alleged carpal tunnel syndrome. However, the ALJ stated that there was no evidence in the medical record to indicate that plaintiff suffered from this impairment. (AR at 9).

[7] Plaintiff also argues that the ALJ also did not consider her right shoulder injury. However, as with the other limitations plaintiff cites, that injury does not relate to her obesity. Furthermore, the ALJ explicitly stated that "the medical "record fails to establish that [her right shoulder impingement syndrome] imposed more than minimal impairments o[n] claimant's ability to engage in basic work related activities. . . ." (*Id.* at 9).

think I have a lot on my mind.

(*Id.* at 29). Plaintiff's own testimony thus indicates that her fatigue derives from the numbness in her hands, her diabetes, and her anxiety, not her obesity.

Moreover all of these limitations cited by plaintiff were self-reported. As noted above, the ALJ determined plaintiff was not entirely credible to the extent that her complaints were inconsistent with his calculated RFC. Thus, the ALJ was not required to give these complaints substantial weight in calculating plaintiff's RFC.

Last, plaintiff cites Dr. Astarjian's comment in his medical assessment that her "inefficient body mechanics jeopardize her mobility even more." (*Id.* at 189). However, the ALJ did consider that comment when calculating plaintiff's RFC. That RFC determination was based predominantly on Dr. Astarjian's medical assessment. (*Id.* at 13). Dr. Astarjian was aware of her obesity and incorporated it into his medical assessment in terms of functional limitations. *See Lafrennie v. Astrue*, 2011 WL 1103278, at *11 (D. Mass. March 23, 2011) (finding that ALJ adequately considered plaintiff's obesity in calculating its RFC in part because it largely mirrored the assessment of the doctor upon whom the ALJ heavily relied); (AR at 187-94). Moreover, while Dr. Astarjian's comment indicates that her continued obesity may further jeopardize her mobility, he does not specifically state how this would limit plaintiff. Without further evidence from a medical source demonstrating that plaintiff's obesity imposed additional limitations, the ALJ adequately accounted for plaintiff's obesity in his RFC. *See Senay*, 2009 WL 229953, at *12-13 (finding that, in the absence of evidence in the medical record to demonstrate that plaintiff's obesity imposed greater functional limitations than those expressed by the state agency examiner, the ALJ adequately took into consideration plaintiff's obesity in his RFC).

In summary, the ALJ adequately considered the effects of plaintiff's morbid obesity when determining her ability to perform substantial gainful activity.

**IV.    Conclusion**

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: August 8, 2011